UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division


IN RE:                                    )        07-70239-DHA
KELLY DANIELS SHEERAN            )


TRANSCRIPT OF PROCEEDINGS
Norfolk, Virginia
May 29, 2007


BEFORE:   THE HONORABLE DAVID H. ADAMS


Appearances:
                 LAWRENCE H. GLANZER, ESQUIRE
                 KELLY M. BARNHART, ESQUIRE
                 Marcus, Santoro & Kozak
                 1435 Crossways Boulevard, Suite 300
                 Chesapeake, Virginia  23320
                 (757) 222-2224
                       Counsel for the debtor

                 JOHN D. McINTYRE, ESQUIRE
                 Willcox & Savage
                 One Commercial Place, Suite 1800
                 Norfolk, Virginia  23510
                 (757) 628-5585
                       Counsel for J. Porter


Also present:
                 KRISTI R. WEAVER, RPR
                 253 West Bute Street
                 Norfolk, Virginia  23510
                       Court Reporter

           (Proceedings recorded by mechanical stenography,
                 transcript produced by computer.)

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| K. D. Sheeran | 3 | -- | -- | -- |

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| A | Bank statements | 16 |
| B | 2-6-07 letter | 22 |

1          (The proceedings commenced at 10:18 a.m.)

2          DEPUTY CLERK:  Item 33, Kelly Sheeran.

3          THE COURT:  All right.  Go ahead.  On behalf of

4     the creditor, Mr. McIntyre.

5          MR. McINTYRE:  Yes, sir, Your Honor.  Your

6     Honor, we can dispense with opening statement, or I'd be

7     pleased to do it.

8          THE COURT:  That's fine.  I've read and am aware

9     of what the issues are.

10          MR. McINTYRE:  If that's the case, Your Honor, I

11     would call Ms. Sheeran to the stand.

12          THE COURT:  Come forward and be sworn.

13

14          KELLY DANIELS-SHEERAN, called as a witness,

15     having been first duly sworn, was examined and testified as

16     follows:

17

18                    DIRECT EXAMINATION

19     BY MR. McINTYRE:

20     Q.   Good morning, Ms. Sheeran.

21     A.   Good morning, Mr. McIntyre.

22     Q.   Ms. Sheeran, if you would, would you just for purposes

23     of the record state the capacity in which you appear today.

24          Are you the debtor in these Chapter 7 proceedings?

25     A.   Yes, sir.

1    Q.    You were divorced seven years back, is that correct,

2    ma'am?

3    A.    Several years ago, yes, sir.

4    Q.    Can you tell me the date of your divorce?

5    A.    No, sir, I don't recall that date with specificity.

6    Q.    Do you recall the year?

7    A.    I believe it was '99 that was finalized.

8    Q.    As part of the divorce decree was there what I'll call

9    equitable distribution of property; that is, you and your

10    husband split up the property you had?

11    A.    Yes, sir.

12    Q.    Did that include any interest in his retirement

13    account?

14    A.    Yes, sir.

15    Q.    Do you have a copy of the divorce decree with you

16    today?

17    A.    No, sir.

18    Q.    Do you know whether or not the divorce decree was ever

19    served on anyone associated with the Armed Forces, Secretary

20    of Defense?

21    A.    No, sir, I don't know that.

22    Q.    Do you recall any of the specific language of the

23    divorce decree itself?

24    A.    As to --

25            MR. GLANZER:  Objection, Your Honor.  That's --

1          MR. McINTYRE:  That's broad.

2          MR. GLANZER:  Can we be specific as to what he's

3 talking about?

4          THE COURT:  Sustained.

5          MR. McINTYRE:  Of course we can.

6 BY MR. McINTYRE:

7 Q.    Do you recall whether there's a certification that your

8 ex-husband's rights under the Civil Relief Act were observed?

9 A.    If you're talking about -- what are you talking about?

10 What does that mean?

11          MR. GLANZER:  Your Honor, I object.  Is he

12 trying to establish that we don't have any entitlement to the

13 retirement pay at all?  If that's the case, that's something

14 for another day.  His objection was to the exception claimed

15 in the retired pay.

16          MR. McINTYRE:  Your Honor, I'm trying to

17 establish the language in the decree itself.

18          THE COURT:  I'll let you inquire; but if she

19 doesn't know the language, you're not going to get there.

20          MR. McINTYRE:  Absolutely, sir.  I'll agree.

21 BY MR. McINTYRE:

22 Q.    In other words, ma'am, there would have been a

23 certification stating something to the effect of your

24 ex-husband's rights under the Serviceman Civil Relief Act

25 have been observed.

1    A.    Mr. McIntyre, I take your word for it.  I don't have

2    any recollection.  I'm not a divorce lawyer.

3    Q.    I don't know either, ma'am.  I haven't seen it.  I'm

4    just asking.  If you don't know, you don't know.  That's

5    fine.

6          When will your husband retire, ma'am -- your

7    ex-husband, excuse me?

8    A.    Sometime in the near future.  I believe this year.

9    Q.    Do you know about when?

10   A.    I believe this summer sometime, but I don't know when.

11   Q.    Okay.  Do you speak to him regularly?

12   A.    About the children, yes, sir.

13   Q.    Okay.  What about his retirement?

14   A.    No, sir, we've never had a discussion about his

15   retirement.

16   Q.    How do you know when he plans to retire?

17   A.    Because my children live with me and they have told me

18   Dad's retiring this summer.

19   Q.    Do you know what your ex-husband's current rank is?

20   A.    I believe he remains a captain, which is an O-5.

21   Q.    And do you recall when he was commissioned?

22   A.    He went to the U.S. Naval Academy and he graduated in

23   '77.  So it's my recollection that the appropriate

24   commissioning date is '77.

25   Q.    Now, are you the sole owner of an entity known as Kelly

1  Daniels-Sheeran Law Firm?

2  A.    Yes, sir.

3  Q.    Can you tell me what that is?

4  A.    It's a law firm that I incorporated on the advice of my

5  CPA, and it is also known as a Subchapter S.

6  Q.    And how many attorneys work in that firm, ma'am?

7  A.    Just myself.

8  Q.    Do you have any other employees?

9  A.    No, sir.  I just have two independent contractors that

10  help me out.

11  Q.    Okay.  And who are they, ma'am?

12  A.    Sharon Barker, she provides me paralegal services on an

13  hourly basis; and Anthony Smith, who provides title

14  examination work when required.

15  Q.    And how much do you pay Ms. Barker?

16  A.    I believe it's approximately $30 an hour.  She gives me

17  a statement at the end of either every week or every two

18  weeks depending on her schedule, because she does go out of

19  town quite a bit and it's not always a certain schedule.

20  Q.    And who is the primary client or clients of Kelly

21  Daniels-Sheeran Law Firm?

22  A.    Currently the Department of Transportation.  I am

23  what's called a contract attorney through the Attorney

24  General's Office with VDOT.  And, second, I am responsible as

25  the administrator of an estate, which should be closing soon.

1  And that is really it.

2  Q.    Okay.  At what rate do you bill VDOT for Ms. Barker's

3  services?

4  A.    VDOT sets the rates.  It's not up to me.  Because we're

5  contract attorneys who bid, it's $50 an hour for a paralegal.

6  Q.    Okay.  And what about Mr. Smith as far as title exams,

7  what do you pay him per title exam?

8  A.    VDOT again sets the price.  They offer -- they make an

9  offer will you do X number of titles for X amount of money,

10  and I've accepted that.

11  Q.    And what is that amount?

12  A.    They pay approximately $300 per title.  And then Mr.

13  Smith and I -- Mr. Smith gets a percentage of that because he

14  does the bulk of the work, and he again sends me a statement

15  with the titles that he did and billing me for his percentage

16  of the work.

17  Q.    And what percentage is that, ma'am?

18  A.    I believe it's 60/40 in his favor.

19  Q.    Okay.  So he charges you 60 percent of $300?

20  A.    Yes, sir.

21  Q.    And do you draw a salary from Kelly Daniels-Sheeran Law

22  Firm?

23  A.    I do.

24  Q.    And when did that commence?

25  A.    Okay.  I began the firm in September.  I did not take

1  wages in September or the beginning of October because it was

2  a new firm and I was scared and there really wasn't enough.

3  I wanted to make sure there was enough to cover the people

4  who I had to pay and expenses.  So with everything that's

5  been going on with this bankruptcy -- and, obviously, I

6  wouldn't be here if I was a really good businesswoman.  I put

7  myself last, took care of other things first.  And with the

8  onslaught of the bankruptcy, the schedules that needed to be

9  filed, with the income tax year approaching, it occurred to

10 me that I needed to set a salary for myself.  And this would

11 have been sometime in January time frame.

12      Up to this point, Your Honor, I would have just given

13 myself if I had extra funds, I would give myself -- the firm

14 would pay me something and then my wages and then -- or what

15 I could take as wages and then I would turn around and I

16 would give it to my husband for our household, you know,

17 miscellaneous or -- and I would keep up with that.  I would

18 keep up with what I paid, because I knew that was going to be

19 income to me and my CPA would need to have that information.

20 But I did not actually set a salary until January time frame

21 when the schedules had instructions and they say to you what

22 are your wages from this time period.

23      And I don't know if Your Honor has ever seen those

24 documents, but, you know, I'm used to doing trial work with

25 lots of experts and heavy exhibits and being paper intensive.

1    But this one really threw me.

2        So I set a salary because I had to answer those

3    questions, and I thought it was fair to set a salary from

4    anywhere between $78,000 a year and $80,000 a year just as an

5    estimate.  And I noted that in the schedules they used the

6    word estimate.  So I estimated a salary beginning in January

7    time frame working backwards for that period of time that I

8    was told I needed to report a salary for purposes of

9    bankruptcy schedules for $1,500 a week or $3,000 semimonthly.

10   Not that I had given myself that amount.  I had not.  But I

11   figured I needed something in writing to establish for

12   purposes of Uncle Sam and moving forward.

13   Q.    If you can, can you tell me just roughly how many hours

14   you billed in the month of September?

15            MR. GLANZER:  Objection, Your Honor.  That's

16   irrelevant.

17            THE COURT:  Mr. McIntyre.

18            MR. McINTYRE:  They're trying to exempt, if I

19   recall, roughly 75 percent of a $20,000 receivable claiming

20   it's wages.  And, Your Honor, I'm trying to establish whether

21   or not that is, in fact, wages or earnings under the Virginia

22   statute, which is 34-29.

23            MR. GLANZER:  If Your Honor please, the

24   exemption is claimed as to wages, not as to billings to

25   clients, as to her wages.  And whether she billed 100 hours

in September of 2006 or 50 hours in September of 2006, which
is the question I think he's asked about, the salary would be
the salary and it wouldn't be dependent upon her hours.

Now, revenues to the firm might be dependent
upon her hours, but that's a different question.  So we
object to the relevance.

MR. McINTYRE:  If I could, Your Honor, I think
that's simplifying it a little too much.  This is a
Subchapter S corporation in which the debtor is the sole
member.  The debtor is trying to set a salary.  And, Your
Honor, while there is no Virginia garnishment case directly
on point, there is a Virginia Court of Appeals case dealing
with workers' compensation issues trying to define earnings
in just this context, which is where an individual owns 100
percent of the business.  And, Your Honor, the rather long
and detailed analysis the Court of Appeals undertakes is what
is attributable to your actual work can be your earnings;
what is profit, dividends, anything else which flows from the
firm as an investment or as a benefit of being an owner is
not.  And, Your Honor, that's the distinction.

In this case what you have is the 100 percent
owner of a Subchapter S corporation saying, well, I'm going
to arbitrarily determine that my salary should be X.  And,
Your Honor, the Court cannot simply accept that at face value
without some inquiry.  There has got to be a factual

1    predicate for reaching that amount.

2              THE COURT:  Are we talking September of '06?

3              MR. McINTYRE:  Yes, sir.

4              THE COURT:  She's already said there was no

5    salary set at that time.

6              MR. McINTYRE:  If that's your position, Your

7    Honor, I can accept it and move on.

8              THE COURT:  Is that correct?

9              MR. GLANZER:  She said she established it sort

10   of retroactively for purposes of preparing her bankruptcy

11   schedule, but at that time that's correct.

12             MR. McINTYRE:  I'm going to argue from the

13   podium, Your Honor, the context of the objection, but I would

14   simply note I don't want it to come back and bite that there

15   was no salary set in January and saying, well, we set it in

16   January but it was retroactive so we get the benefit of that

17   on the back end.  If that's what they want, Your Honor, I

18   think we have to go through the whole analysis from September

19   forward.  If they say, no, it starts in January, that's fine.

20             THE COURT:  Mr. Glanzer.

21             MR. GLANZER:  Your Honor, again, I don't know

22   what the case is that he's referring to.  He hasn't cited it

23   and I haven't seen it.  But it seems to me, Your Honor, that

24   she has testified that in September, October one reason that

25   she didn't bother setting a salary for herself was that there

1   was no money to pay her a salary.  If we take Mr. McIntyre's

2   theory of look at the revenues and the net revenues

3   presumably of the firm, there weren't any.

4          And so we're talking about really nothing at

5   this point and I don't -- again, I object to the relevance.

6          MR. McINTYRE:  Your Honor, I would stand on my

7   last comment.  I don't know that much was added to it.  If

8   their position is it's retroactive and they can argue that

9   and establish a receivable based on that, they might as well

10   say it was $2 million and the firm owes her $500,000.

11          THE COURT:  True.

12          MR. GLANZER:  By the same token, Your Honor, if

13   Mr. McIntyre carries this forward in the direction he's

14   heading, he's going to establish there wasn't a receivable.

15   And if there is no receivable, no amount due for salary, then

16   the argument about the exemption of that amount is kind of

17   moot.  That's the logical implication of where he's going

18   with this.

19          MR. McINTYRE:  She has a receivable, Your Honor.

20   It's not exempt property of the estate.

21          THE COURT:  I understand.  Go ahead.  I'm not

22   going to -- I'll deal with it if it comes back.

23          MR. McINTYRE:  Thank you, sir.

24   BY MR. McINTYRE:

25   Q.   Ms. Sheeran, let me repeat that.  I know a lot of water

1    passed under the bridge since I asked.

2         Can you estimate, just estimate, if you can, the number

3    of hours you billed in the month of September of 2006?

4    A.    I can't fairly do that and give you the correct answer.

5    Q.    Do you have any idea how much roughly per day you were

6    working?

7    A.    Mr. McIntyre, here's what I've learned through this

8    whole process is never to guess about anything ever again.

9    If you've got my billable statements in front of you, I'd be

10   happy to look at them.

11                MR. McINTYRE:  If I could have just a moment,

12   Your Honor?

13                THE COURT:  Surely.

14   BY MR. McINTYRE:

15   Q.    Ms. Sheeran, do you recall being deposed in my office?

16   A.    I do.  And I never got an opportunity to read the

17   deposition and review it as I have requested.  I didn't know

18   it was ready.

19   Q.    Do you recall estimating roughly between four and five

20   hours a day back in September?

21   A.    I believe you asked me how much did I work on a daily

22   basis.  That would probably be very close to being correct,

23   because September I was in the throes of the bankruptcy

24   preparation and whatnot.  So that's a very good estimate.

25   Q.    Okay.  I'm going to hand you a document, if I can.

1      Ms. Sheeran, can you flip through there and tell me if

2  you recognize those documents?

3  A.   It appears to be a bank statement with my law firm, and

4  the first statement on top is dated September 29th of '06 and

5  it carries forward through January --

6  Q.   Okay.

7  A.   -- 31st.

8  Q.   Do you recall whether you provided these documents in

9  response to discovery in this case?

10  A.   Absolutely.  Anything that you have with my name on it

11  was provided.

12           THE COURT:  Let me just comment.  What was given

13  to me also has a statement, and see if you have it before

14  you, for March 30th, '07 at the very end.

15           MR. McINTYRE:  It should not, Your Honor.

16           THE COURT:  Sir?

17           MR. McINTYRE:  It should not.  If it does -- oh.

18           THE WITNESS:  Mine does not, Your Honor.

19           MR. McINTYRE:  I'll give the witness mine, Your

20  Honor.

21           THE COURT:  All right.  I can take it out if

22  it's not a question about it.

23           MR. McINTYRE:  It's just not relevant, Your

24  Honor.  It doesn't matter either way.

25           THE COURT:  I just want to make sure we're all

1   looking at the same thing.

2          MR. McINTYRE:  I can introduce these

3   individually, Your Honor, or just as a global exhibit.

4          THE COURT:  It's your choice.

5          MR. McINTYRE:  I move to mark them collectively

6   as Exhibit A.

7          THE COURT:  All right.  The Towne Bank bank

8   statements for Kelly Daniels-Sheeran Law Firm, P.C. beginning

9   the statement date September 29, '06, ending with the

10   statement date of March 30, '07 will be Exhibit A.

11          (The documents were received in evidence.)

12          MR. McINTYRE:  Thank you, sir.

13   BY MR. McINTYRE:

14   Q.    Ms. Sheeran, is there another account your law firm has

15   other than this one?

16   A.    Not specifically a law firm account, no, sir.  I have

17   other accounts.

18   Q.    But your firm itself does not?

19   A.    No, sir.

20   Q.    So we're clear, there is a fiduciary account for the

21   estate?

22   A.    That's for the Ann Cutchin estate, C-U-T-C-H-I-N.  It's

23   not for the law firm.  It's a decedent's estate.

24   Q.    If you would look at the November bank statement for

25   me, please.

1  A.    Yes, sir.

2  Q.    By looking at that statement, perhaps the check is

3  attached, can you tell me how much Ms. Barker was paid by

4  your firm during that month?

5            MR. GLANZER:  Your Honor, I'm going to renew my

6  objection on relevance.  We're talking about the exemption of

7  the debtor's wages, and the compensation or payments that

8  were made to third parties is just not relevant.

9            THE COURT:  Well, I understand.

10            MR. McINTYRE:  Thank you, sir.  I was simply

11  going to say, Your Honor, Ms. Barker is a contract paralegal.

12  She's being billed at a profit of roughly $20 per hour.  So

13  as far as the firm's earnings go for billings and collection,

14  I think it is relevant to show the status of the S corp and

15  what was received and, thus, possibly go as far as whether or

16  not Ms. Sheeran is getting profit or whether she's getting

17  wages.  That is to say, I'm sorry, sir, the firm can only

18  bill as much as the professionals can produce on an hourly

19  basis.  So if the billings to VDOT were X dollars, then that

20  would tend to show that the professionals billed a similar

21  amount.  This is going to go to show what portion of the

22  receivables brought into the firm during the relevant period

23  of time were attributable to Ms. Barker and which were

24  attributable to the debtor.

25            MR. GLANZER:  If Your Honor please, it seems to

1    me he's engaging in an effort to pierce the corporate veil of

2    the professional corporation.  The corporation is a separate

3    legal entity and its billings to its clients are its billings

4    to its clients.  It's not the debtor's compensation, and they

5    are different issues.

6             THE COURT:  That's two different amounts,

7    obviously.

8             MR. McINTYRE:  Obviously, sir.

9             THE COURT:  There's no overhead and cost and

10   taxes and everything else.

11            But going back to the question from the bank

12   statement, you're asking her can she say how much was paid

13   Ms. --

14            MR. McINTYRE:  To Ms. Barker, yes, sir.

15            THE COURT:  Can you answer that in September?

16            THE WITNESS:  I hope so.

17            Now, sometimes my paralegal has requested cash.

18   So if she's been paid more than the bank statement shows with

19   the copied checks, I couldn't answer that.  However, I do see

20   on page 3, Your Honor, dated November 30th of '06 there's one

21   check payable to her in the amount of $1,000.

22            THE COURT:  Wait a minute.  The question, excuse

23   me, I thought was September.

24            MR. McINTYRE:  No, sir, November.

25            THE COURT:  Oh, I'm sorry.  Let me get to the

1    right -- the November statement.

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Go ahead.

4              THE WITNESS:  Yes, sir.  There's one check

5    payable to her in the amount of $1,000 and a second check at

6    the top of the page in the middle column again payable to her

7    in the amount of $1,000.

8              THE COURT:  Okay.

9              THE WITNESS:  So it appears from the checks only

10   that she received $2,000.

11   BY MR. McINTYRE:

12   Q.    And there could be more in cash, is that correct,

13   ma'am?  Hard to say?

14   A.    Hard -- I would only be guessing, but that's always a

15   possibility.  I do, of course, do 1099s on her, and I keep a

16   ledger book on her specifically, which would answer your

17   question to the T.

18   Q.    Would you look at the first page of the November

19   statement and tell me how many deposits there were in what

20   amount total?

21   A.    Let's see.  I'll read from it.  It says previous

22   statement balance as of October 31st of '06 was $7,478.58,

23   and then it says plus three deposits and other credits

24   totaling $4,735.33.

25   Q.    And do you know where -- who would have paid in the

1   $4,735.33?

2   A.   Well, my best guess would be, of course, that would

3   have been from any client paying me, and at that time that

4   would have been the Department of Transportation.

5   Q.   And what's their turnaround time?  If you bill them on

6   the 1st of the month, typically when do they pay you?

7   A.   They have a rule -- and, Your Honor, I don't know if

8   this goes back to what Mr. Glanzer and Mr. McIntyre were

9   talking about a little earlier.  You have to understand when

10   you're dealing with a state, you might send out a bill every

11   15 days, and somebody would call that a receivable; but it

12   can't go out until we reach a $1,000 threshold, because

13   they'd be doing so many checks, their comptrollers.  So a lot

14   of times there's a lot of turnaround time.  It could be a

15   month, it could be two months.  Depending on the project and

16   if the project has been funded, it could be even longer than

17   that.  So there's really no tight answer of when I would

18   expect to receive a receivable.

19          THE COURT:  All right.

20   BY MR. McINTYRE:

21   Q.   If you would look at the December statement.  Page 3 is

22   the -- are the canceled checks.  There appear to be two to

23   Ms. Barker, each in the amount of $1,000; is that correct?

24   A.   Yes, sir.

25   Q.   Okay.  And if you'd go to the first page of that

1     statement, looks like there's deposits of $5,761.18; is that

2     correct?

3     A.    Yes, sir.

4     Q.    Would that be all VDOT money or almost all VDOT money

5     at this stage?

6     A.    Yes, sir.

7     Q.    Okay.  If you'd look at the January statement, again

8     turn to page 3.  Ms. Barker appears to have received $2,000;

9     is that correct?

10     A.    Yes, sir.

11     Q.    Okay.  And if you'd turn to the first page, deposits,

12     $747.70; is that correct?

13     A.    Yes, sir.

14     Q.    Ms. Sheeran, just a couple more questions.  The

15     marshall has handed you a letter dated February 6th --

16     A.    Yes, sir.

17     Q.    -- 2007.

18     A.    Yes, sir.

19     Q.    Can you identify that for me?

20     A.    It is a letter addressed to me as -- I would assume as

21     the principal of Carr & Porter, L.L.C.

22     Q.    Do you recall receiving that letter?

23     A.    Not as of February 6th or quickly thereafter, no, sir.

24     Q.    Okay.  But have you received that letter?

25     A.    Yes, sir.

1          MR. McINTYRE:  Okay.  Your Honor, I'd move to

2     introduce that as Exhibit B.

3          THE COURT:  All right.  Without objection?

4          MR. GLANZER:  I have no objection to that, Your

5     Honor.

6          THE COURT:  That will be Exhibit B to this

7     hearing.

8          (The document was received in evidence.)

9          MR. McINTYRE:  That's all the questions I have,

10     Your Honor.

11          THE COURT:  Mr. Glanzer.

12          MR. GLANZER:  Your Honor, I have no questions at

13     the time.  I reserve the right to call her later.

14          THE COURT:  All right.  Thank you, Ms.

15     Daniels-Sheeran.  You may stand down.

16          THE WITNESS:  Yes, sir.  If Your Honor wants to

17     call me Ms. Sheeran, that's fine.  It's a mouthful.

18          THE COURT:  I noticed this letter was that way,

19     hyphenated.

20          THE WITNESS:  I did it for the children.  It's

21     very hard.

22          MR. McINTYRE:  No further witnesses, Your Honor.

23     I rest.

24          THE COURT:  All right.  Mr. Glanzer.

25          MR. GLANZER:  Your Honor, before going forward

1    then it seems to me, Your Honor, that the burden of proof is

2    on the objecting party, and the burden of proof has not been

3    met as to any of the objections that have been raised.  I

4    haven't heard anything today that frankly matters.

5              Certainly as to the first item that was

6    discussed, the retire pay, the exemption that was claimed

7    with respect to the retired Navy pay of the debtor's

8    ex-husband, there was nothing said at all that would

9    challenge the objection -- excuse me, challenge the exemption

10   or, frankly, even the arguments that were made in the

11   response that we filed to the objection to the exemptions,

12   and I think that one fails on its face.

13             The objection to the exemption of the

14   compensation under Section 34-29 of the Virginia Code

15   similarly has not been carried.  There was testimony about

16   it, but I don't think there was anything that challenged the

17   exemption itself, unless the Court finds from what was said

18   that, in fact, there was no amount that was actually due

19   because the salary hadn't been established yet.  That's the

20   best that they have established.

21             And if that's the case, there's nothing to argue

22   about.  They haven't shown for what period of time.  There's

23   been no evidence as to what period of time is covered by that

24   $20,000 that is claimed as exempt.  There's just nothing

25   before the Court on which the Court could sustain that

1    objection.

2            And as for the third item that was covered by

3    the very brief examination on the point, the IRA exemption,

4    the exhibit shows that there was an over funding of the then

5    401(k) account.  But the law on that is interesting, Your

6    Honor.  The Supreme Court of the United States in the Guidry

7    case, and I can provide the citations to the Court, but in

8    the Guidry case, which was decided before Patterson v.

9    Shumate, indicated that -- and that was a case in which a

10   union official, Your Honor, had embezzled some money from his

11   pension funds and an attempt was made to reach his 401(k)

12   accounts with the union.  And the Supreme Court held in that

13   case that it doesn't matter.  Once it's in the 401(k), it is

14   unavailable, unreachable by creditors.

15           The Ninth Circuit in the Conner decision, a

16   decision that has been cited by courts in this circuit and,

17   in fact, this district, held that where a debtor had funded a

18   retirement account with aftertax dollars so that the money

19   would be withdrawable and reachable by the debtor at will,

20   notwithstanding that, once the money is in that retirement

21   account, it's beyond the reach of creditors.  It may create a

22   tax issue, and I think in this case it does create a tax

23   issue when the money is ultimately withdrawn, but that's all

24   it establishes.  It doesn't affect the exemption itself.

25           And Section 34-34(h) of the Code of Virginia now

says, has for some time said that an IRA account shall be

essentially afforded the same treatment that 401 accounts are

afforded under the bankruptcy code.  It's just not available.

The tax issue is between the debtor and the Internal Revenue

Service.  It's not between the debtor and the trustee and

it's not between the debtor and its creditor.

So on the face of things, Your Honor, I think

they have failed in their burden of proof, and we would move

for judgment on partial findings.

The fourth item we've conceded.

THE COURT:  I wanted you to address that.

MR. GLANZER:  We did concede, Your Honor,

there's no question it was not on the homestead deed; and to

the extent it wasn't on the homestead deed, it's not exempt.

I'm not sure there's a difference between potential

inheritance and contingent interest in the decedent's estate;

but on the other things, we did not include them on the

homestead deed.  If they existed, they wouldn't be exempt.

They don't exist, and I think that's pretty much a moot point

right now.

THE COURT:  All right.  Mr. McIntyre, you don't

have to deal with number four.

MR. McINTYRE:  Thank you, sir.

Your Honor, that really does bring it down to

three issues.  With the Court's permission, I'll just take

1      each one in turn as it was raised in the direct examination.

2      Your Honor, the first is retirement pay.  The genesis of the

3      objection was simply that the statutes -- originally that the

4      statute cited didn't support an exemption because it didn't

5      deal with military retirement pay.  In response, Your Honor,

6      the debtor basically raised, if I understand it correctly,

7      what appears to be a four-prong argument as to why the

8      debtor's interest in her ex-husband's retirement pay is not

9      property of the estate or is exempt from property of the

10     estate:  First, that her rights in and to the payments are

11     not assignable under 10 USC Section 1408(c)(2); two, that her

12     rights are contingent; three, that her rights are, in

13     essence, a long-term payment stream and thus not subject to

14     administration by a Chapter 7 trustee; and, four, that the

15     payments are in reality future wages, although I think this

16     is sort of an afterthought or, you know, last-ditch

17     throwaway.  Your Honor, that's on the response, pages 5

18     through 7.

19              Taking each of those points in turn, Your Honor,

20     10 USC Section 1408(c)(2), Your Honor, is a statute which was

21     enacted to ensure that a court of competent jurisdiction,

22     being a divorce court basically, has the ability to treat a

23     service member's right to retirement pay not only as his own

24     personal property but community property so that it can be

25     distributed in an equitable distribution proceeding.

1          Your Honor, the language of the subsection on

2     which the debtor relies states, Notwithstanding any other

3     provision of law, this section does not create any right,

4     title, or interest which can be sold, assigned, transferred,

5     or otherwise disposed of by the spouse or former spouse.

6          Your Honor, the language of the statute itself

7     and the legislative history, which is the house report, make

8     clear that Congress' intention was simply to ensure that by

9     enacting the statute the ex-spouse was not given better

10    rights than the serviceman himself had.  That is to say, if

11    the serviceman can do it, the ex-spouse can do it.  If he

12    can't or she can't, then they can't.

13         Your Honor, Section 541(c)(1) includes within

14    scope of property of the estate any interest in property

15    regardless of a restriction on transfer contained within

16    applicable nonbankruptcy law, and that is 541(c)(2).  The

17    only exception, Your Honor, is the so-called spendthrift

18    trust provision, which is (c)(2), and that is any interest of

19    the debtor in a trust which contains a non-assignability

20    provision does not become property of the estate.

21         Your Honor, military retirement pay is not a

22    trust fund system.  The debtor hasn't suggested it is, hasn't

23    cited authority that it is, and it is not.  So, Your Honor,

24    10 USC Section 1408 regardless of whether it applies or not,

25    I would note there are a number of conditions that have to be

met, including the divorce decree has to contain a
certification saying that the serviceman's rights under the
Serviceman's Relief Act have been complied with; there are
marriage requirements, 10 years.  There are a variety of
conditions even for that section to apply.

But even assuming it does apply, Your Honor, it
doesn't carve out by its own terms and pursuant to Section
541(c)(1) this property from property of the estate.  They
haven't said it does, Your Honor.  It doesn't.

I would note, Your Honor, a simple
non-assignment -- if I put in language in a note saying I'm
going to pay Ms. Pyle $1 million and this note is not
assignable, if I file bankruptcy -- or, excuse me, if she
files bankruptcy, that does not exclude that property from
her estate.  It's got to be a trust, and this is not, Your
Honor.

Their next argument that her rights are
contingent and I believe at some point they use the term
non-vested is also not correct.  There's a divorce decree.
It's been entered.  If her ex-husband retires and elects to
receive pay, she's going to get her fair share, and nothing
will change that.  While the receipt of those funds at some
point in the future may be up in question, it's that way for
anything, Your Honor.

Again, using the example of a note payable, if I

1    sign a 10-year note, Your Honor, and it is not payable by my

2    estate, solely payable while I'm alive for $1 million and I

3    give it to Ms. Pyle and she files bankruptcy, the fact that I

4    could get run over by a truck tomorrow doesn't exclude that

5    note from property of the estate.  Are the payments

6    contingent?  Sure they are, because I have to be alive.  But

7    Ms. Pyle's rights to that note are fixed and determined.

8    That is to say, if the payment is made because I'm alive,

9    she's getting it.

10              Your Honor, contingent interests are property of

11    the estate, and there is simply nothing in the bankruptcy

12    code which would state otherwise.  It would be re-writing

13    Section 541 to say so.

14              Your Honor, the next argument the debtor raises

15    is the long-term nature of the payments, basically turn this

16    into a quasi Chapter 13.  And I believe they relied on the

17    Cox opinion for that proposition.  Your Honor, with due

18    respect to the court in Cox, I would simply argue that -- or

19    note that again we're re-writing Section 541 to say that.

20    There is no exclusion within that statute saying if this is a

21    long-term payment stream and you file Chapter 7, then it gets

22    carved out from the estate.  There's a question as to what

23    it's worth, just like with the note example, and there's a

24    question as to whether or not the debtor could properly file

25    a motion to compel abandonment, no value to the estate.  But

1      that's not an exemption.

2              Your Honor, 541 is to be interpreted as broadly

3      as possible, and the fact that this is a long-term payment

4      stream doesn't exclude it from property of the estate or

5      otherwise make it exempt.  And to the extent that the Cox

6      case says that, Your Honor, I would -- due respect to the

7      court in Cox, it's simply wrong.  541 doesn't work that way.

8      They can try and get it out on another front, but it's

9      property of the estate and doesn't make it exempt.

10             Your Honor, the last argument they raise is I

11     think they cite to the Moorehouse case saying basically where

12     a serviceman has a right to retirement pay, it's excluded

13     from property of the estate.  But that's because, Your Honor,

14     retirement pay is deemed to be pay.  That is future wages.

15     That's just the way the statute is written and it's

16     interpreted.

17             In this case, Your Honor, the debtor is not the

18     serviceman.  Her ex-husband is.  This is not her future

19     wages, which would be excluded from property of the estate in

20     a Chapter 7 proceeding.  I would simply suggest that to the

21     extent they're going to rely on the case, it doesn't apply.

22             So, Your Honor, the retirement account, while

23     it's a hard one, is property of the estate.  Whether it has

24     value or not, I don't know.  The debtor has testified that

25     her ex-husband plans on retiring this summer.  He's an O-5,

Your Honor, which means he's probably going to get a fair

amount of money on his retirement pay.  If I recall

correctly, he was commissioned back in '77.  So, Your Honor,

even if it's four or five, six, 10 payments, it's something.

But it's property and it's property of the estate.

Your Honor, with regard to the receivable, we've

basically run through the majority of the argument in the

course of the evidentiary objection.  But, Your Honor, if it

would help, I would simply cite to the case Robert Walter

Smith versus Robert W. Smith.  And that, Your Honor, is a

Virginia Appellate case, 32 Va. App. 242.  That is a 2000

opinion.  In that case, Your Honor, although cited under

workmen's compensation laws, as I indicated previously to the

Court, that decision wrestles with this same problem; and,

that is, you've got an individual who is basically

self-employed.

I apologize, Your Honor.  I'm getting a little

dry.

THE COURT:  I have the same affliction.

MR. McINTYRE:  You have an individual who is

self-employed, Your Honor, and the court reverses the lower

court's ruling saying, well, everything that the individual

gets is obviously wages and says, no, you've got to do a

factual determination as to what is earnings and what is not.

Your Honor, the statute which the debtor relies

1    on, which is 34-29, says the term earnings means compensation

2    paid or payable for personal services and goes on to say

3    whether denominated as wages, salaries, commissions, and the

4    like.

5              But, Your Honor, the test is whether it is for

6    personal services.  And, Your Honor, the court in Smith

7    specifically noted that, and I quote, The general rule is

8    that profits derived from a business are not to be considered

9    as earnings and cannot be accepted as a measure of loss of

10   earning power unless they are almost entirely the direct

11   result of the claimant's personal management and endeavor.

12             They go on to do an analysis of several dates,

13   Your Honor, noting that in New York where a self-employed

14   claimant performs primarily a supervisory function, the

15   resulting income may be classified as profit from an

16   investment rather than wages for purposes of calculating an

17   average weekly wage.

18             Your Honor, there are two problems in this case

19   with the $20,000 receivable.  The first is simply an

20   evidentiary one.  The debtor was quite clear that as of

21   September when the business was started she did not have a

22   salary, had not set a salary.  November, October, December,

23   no salary set.  In January, which was a month before the

24   petition date, that's when the salary was set, and they're

25   trying to make that retroactive.

1        Your Honor, you can't do that.  If the debtor

2   was not producing income, wasn't working at the firm for any

3   reason, whether it's administrative, whether it's because of

4   the bankruptcy, whether there are personal reasons, whatever

5   it is, Your Honor, if the debtor wasn't in there working,

6   then the debtor is not entitled to simply set an arbitrary

7   salary without any foundation, without any basis, and make it

8   retroactive to the date of the start of the company and then

9   say, well, now I'm owed a receivable.

10        Because, Your Honor, if they can in this case,

11   it might as well be a million, might as well be 2 million,

12   could be anything.  And at the end of the day whatever profit

13   is left in this business, that -- because that's the only way

14   she's getting paid, Your Honor, is the profit they'll pay on

15   that receivable and claim it's exempt.  Your Honor, there has

16   to be a factual foundation.

17        I would suggest to the Court where you have an

18   individually-owned Subchapter S corporation, it has to be set

19   on the front end, not the back end immediately prior to the

20   bankruptcy filing to try and figure out what can be claimed

21   as a receivable, if you will.

22        So, Your Honor, from that standpoint the

23   evidence is clear for the whole time they're claiming this

24   account receivable accrued except for January there was no

25   salary set.  Four out of five months, Your Honor, there was

no salary set.  I would respectfully suggest, Your Honor,
they don't get to make it up and make it retroactive to apply
on the back end.

Your Honor, the bank records which I think were
questioned as to their relevance by opposing counsel
establish one thing for the period of time in question; and,
that is, the majority of the receipts for these first few
months of the firm were generated by Ms. Barker.  The
testimony was she's paid $30 an hour, she's billed out at $50
an hour.  That's a $20-an-hour markup.  By my calculation,
this is very rough, Your Honor, that's roughly $1,300 per
$2,000 of markup.  So if Ms. Barker is paid $2,000, the firm
can bill $3,200.  The receipts were all in the 4- and $5,000
range.  That extra $1,000 and $2,000 does not support a
salary of $1,500 a week or $6,000 a month.  It just doesn't.
If that's the level of the debtor's production, it doesn't.

So, Your Honor, on the account receivable I
would simply note that for it to be wages, there's got to be
a foundation.  There's got to be a salary established on the
front end.  And it's a factual determination.

Mr. Glanzer's comment was we bear the burden of
proof, and that's true.  But, Your Honor, initially we bear
the burden of persuasion.  And when we call into question
what the debtor has claimed as exempt, when we raise the
factual issue and raise in the Court's mind some question as

1    to whether that receivable or the retirement pay or anything

2    else is properly exempted, the burden then shifts to the

3    debtor to come forward and establish it is appropriate.  And,

4    Your Honor, I would suggest that given the bank records,

5    given Ms. Barker's billings, given the debtor's testimony as

6    to when the salary was established and the attempt at making

7    it retroactive in relation to the retirement pay, same thing,

8    Your Honor, mostly a legal argument, but everything the

9    debtor has testified to shifts the burden into their court,

10   and they've offered nothing evidentiary to rebut to the

11   Court.

12             THE COURT:  They haven't rested and said they're

13   not going to put on evidence.  This is a preliminary motion.

14             MR. McINTYRE:  Yes, sir.

15             Your Honor, the last one I think was the IRA

16   account.  And Mr. Glanzer cited to some cases for the

17   proposition, if I understood him correctly, that once money

18   is in a 401 account, it is sacrosanct.  And I would suggest,

19   Your Honor, that is overstating the case.  The letter from

20   Mr. Peterson clearly states that too much money was funded

21   into the 401(k) program.  This letter was written on the same

22   day the debtor filed bankruptcy and requires her to instruct

23   her 401(k) administrator to refund roughly $2,500, $2,700,

24   Your Honor.

25             Your Honor, if Mr. Glanzer's comment was right,

1     the debtor could put in $2 million prior to filing

2     bankruptcy, even if it's contrary to law, and because the IRS

3     or some governing body had not yet ruled it must be

4     discharged, that makes it exempt from her creditors.

5               Your Honor, that can't be the law.  If the

6     debtor has put in money to a 401(k) in violation of

7     applicable law, it doesn't get the same exemption protection.

8     Otherwise, Your Honor, people would over fund constantly on

9     the eve of bankruptcy and then just say, well, you can't get

10    it and when I give it back, I'm giving it back to myself

11    anyway, but I'll be out of bankruptcy and it will be all

12    mine.  The law doesn't work that way, Your Honor.

13              I would respectfully suggest we have met our

14    burden of at least shifting the burden to them.

15              THE COURT:  Mr. Glanzer.

16              MR. GLANZER:  Thank you, Your Honor.  Taking the

17    items in the same order, Your Honor, the military retire pay,

18    it's interesting to note that counsel for Mr. Porter has not

19    cited a single case in support of his position, whereas we

20    cited a number of cases in support of our position.  And his

21    response to that is, well, those cases are just wrong.

22              Your Honor, Judge Mitchell's decision in

23    Moorehouse, which was reported at 180 BR 138, notes in

24    Footnote 7 that -- he says, While the rationale has varied,

25    the reported cases have consistently held that military

retired pay is not property of the estate in Chapter 7 cases.

And one of the cases that Judge Mitchell cites to is Stackhouse versus Cox, 146 BR 669, in which the debtor's interest under a divorce decree in her former husband's military retirement pay was held not property of the estate.

We submit, Your Honor, that the law is very clear generally across the country and particularly in this district that a spouse's interest in military retire pay simply is not property of the estate in a Chapter 7 case. We do count it for Chapter 13 purposes, but this is not a Chapter 13 case.

I'm not sure I understand the argument that was put forward with regard to the necessity of compliance with the statute, unless the suggestion is that there hasn't been compliance and, therefore, the debtor isn't entitled to any of the military retirement pay at all. We don't believe that's the case. Captain Daniels was represented by counsel in the divorce, as I understand it, and so was the debtor. I'm sure that able attorneys did their jobs. But at the end of the day, the law is clear. This is not property of the debtor's estate.

Was the exemption properly claimed? I have to concede, Your Honor, wrong statute was cited. On the other hand, is it necessary to exempt this at all? I think that

1    the law is fairly clear that it is not, because it is not

2    property of the estate in the first place.  And I think it's

3    very clear that the objecting party's case has not been made

4    on that point.

5              Again, Your Honor, with regard to the 34-29

6    exemption, we submit that there is a difference between a

7    corporate entity and an individual.  And in this case there

8    is an attempt to blur the lines between receivables of the

9    Subchapter S corporation, a professional corporation, and the

10   amounts that are owed to the debtor.  Whether the debtor was

11   right or not right in attempting retroactively to establish a

12   baseline salary for herself, the fact of the matter is that

13   the money wasn't there to pay her at that time.  That was her

14   testimony.

15             So that if we -- if we take Mr. McIntyre's

16   position and try to analyze the profits at that time, well,

17   the answer you come up with is there weren't any.  And if

18   there weren't any, then, again, we're not arguing about

19   anything of any consequence.  Because if there were no --

20   under his analysis if there were no profits, there's nothing

21   due.

22             Whether it's true or not, Your Honor, that the

23   bulk of receipts were attributable to the efforts of Ms.

24   Barker, I don't think her name should strike anyone as

25   remarkable.  I don't know that's the case or not, but I think

1    the general idea behind a law firm is you get people to

2    generate revenues for the law firm at whatever level they're

3    working.  And if that's where it was coming from, I don't see

4    where that's an issue or a problem or something to be

5    criticized.  Even if it were true, they weren't significant

6    profits being generated.  There's been no evidence offered,

7    frankly, of how much of the receipts constitute profits in

8    the pre-petition period.

9            So, again, I don't understand what they were

10    attempting to establish with their evidence, but whatever it

11    was, it didn't make the case that the exemptions should not

12    be claimed.

13            Candidly, Your Honor, I cannot speak to the

14    workers' comp case.  I haven't read it, but I don't think it

15    bears upon this matter.  The facts are that even if -- even

16    if he's right, there were no profits to be owed to the debtor

17    during the relevant time period, in which case she's claimed

18    a right to an asset that doesn't exist and the objection is

19    moot.

20            On the IRA, Your Honor, I mentioned two cases to

21    the Court earlier.  The first is Guidry, G-U-I-D-R-Y, versus

22    Sheetmetal Workers National Pension Fund.  It's reported at

23    493 US 365, decided in January of 1990.  That was the case,

24    Your Honor, in which the former officer of the pension fund,

25    in fact, multiple pension funds, he was a union official, had

1   embezzled significant dollars from the union, and there was

2   an attempt to propose a constructive trust on his retirement

3   funds.  And the Supreme Court said, he's a bad guy, we have

4   to agree with that; but once it's in a retirement account,

5   Congress made the law and that's what it is, it's beyond the

6   reach of creditors; you can't establish a constructive trust

7   with respect to those funds, even if they're embezzled funds,

8   and found their way into the retirement account; you can't

9   garnish it.

10          And then the other case, Your Honor, is Barkley

11  versus Conner, B-A-R-K-L-E-Y versus Conner, C-O-N-N-E-R,

12  reported at 73 F 3rd 258, a Ninth Circuit decision from

13  January of 1996.  Cert was denied in that case, 519 US 817,

14  1996.  In that case, Your Honor, there had been a funding of

15  an ERISA-qualified, tax-qualified plan using aftertax

16  dollars, aftertax contributions.  And notwithstanding the

17  fact that the dollars contributed were aftertax dollars, the

18  Ninth Circuit held that they were excluded -- that amount was

19  excluded from the bankruptcy estate on the same rationale.

20  And Conner has been cited, as I said, by cases in this

21  district and circuit.

22          The hypothetical that was proposed may present

23  an interesting question for someone at a later time, but it's

24  not our case, Your Honor.  This is not a matter of someone's

25  having fraudulently transferred money into an account to

conceal it from creditors, you know, on the eve of

bankruptcy.  This is -- these were contributions -- well,

there's really no evidence on this, but we're talking about

$2,400, Your Honor.  And the letter from Goodman & Company

which was introduced into evidence arrived on February 6th --

excuse me, was dated February 6th.  I believe this case was

filed two days later.  It's not something that is earth

shattering either in amount or in the way the matter

developed, and it's a fairly everyday occurrence.  There

was -- the letter indicates that as a result of compliance

testing that contribution had to be disallowed.  That doesn't

smack of any kind of fraud here, and I don't think we need to

worry about the camel's nose getting under the tent if it is

found properly that the money in the IRA account was properly

claimed as exempt.  If there's a tax issue, there's a tax

issue, but the amounts were exempt.

            Thank you, Your Honor.

            THE COURT:  All right.  What I'm going to do is

take the motion under advisement.  Obviously, I want to read

through this and digest it and consider it.

            And at this time I'm going to ask, Mr. Glanzer,

do you want to put on any evidence knowing that I'm taking

that under advisement?

            MR. GLANZER:  May I have a moment, Your Honor?

            THE COURT:  Surely.

1          (There was a discussion off the record.)

2          MR. GLANZER:  Your Honor, we will not put on any

3   further evidence.

4          THE COURT:  All right.  So the matter is

5   submitted to the Court and you'll hear from me after I've had

6   a chance to review this.

7          MR. GLANZER:  Thank you, Your Honor.

8          MR. McINTYRE:  Thank you.

9          THE COURT:  Appreciate it.

10          (The proceedings concluded at 11:18 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3          I, Kristi R. Weaver, Registered Professional

4    Reporter, certify that I recorded verbatim by stenotype the

5    proceedings in the captioned cause before the HONORABLE DAVID

6    H. ADAMS, Judge of said Court, Norfolk, Virginia, on the 29th

7    day of May, 2007.

8              I further certify that to the best of my knowledge

9    and belief, the foregoing transcript constitutes a true and

10   correct transcript of the said proceedings.

11             Given under my hand this        day of

12                   , 2007, at Norfolk, Virginia.

13

14

15

16

17             _____

18                   Kristi R. Weaver, RPR,

19                   CCR No. 0313158

20

21

22

23

24

25